IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MICHAEL E. BEATTY, M.D., P.C. d/b/a THE SOUTHWESTERN ILLINOIS PLASTIC & HAND SURGERY ASSOCIATES, individually and as the Representative of a class of similarly-situated persons and entities, | ) ) ) ) ) | |
| Plaintiffs, | ) | NO: 3:17-cv-01001 |
| vs. | ) ) | |
| ACCIDENT FUND GENERAL INSURANCE COMPANY, et al. | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND INCORPORATED MEMORANDUM IN SUPPORT**

## **TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................... 2

II.    BACKGROUND ....................................................................................... 4

    A.    The Pleadings ................................................................................. 7

       1.    Plaintiffs' Claims .......................................................... 7

       2.    The Defendants' Counterclaims ................................... 9

    B.    The Course of This Litigation ....................................................... 9

       1.    Motions to Dismiss ..................................................... 10

       2.    Motions for Reconsideration and Interlocutory Appeal ............... 13

       3.    Motions for Summary Judgment ................................ 13

       4.    Motions to Dismiss Defendants' Counterclaims ......... 14

       5.    Discovery .................................................................... 14

       6.    Mediation .................................................................... 15

III.    THE SETTLEMENT AGREEMENT ................................................... 16

    A.    The Class ....................................................................................... 16

    B.    Monetary Relief For The Classes ................................................. 17

    C.    Exclusion From The Class And Release of Claims ..................... 20

    D.    The Notice Program ..................................................................... 20

    E.    Opt-Outs And Objections ............................................................ 21

    F.    The Claims Process ...................................................................... 21

    G.    Payment of Claims ....................................................................... 22

    H.    Class Representative Incentive Award ......................................... 23

    I.    Attorneys' Fees and Costs ........................................................... 23

IV.    PRELIMINARY APPROVAL AND SUBSEQUENT DEVELOPMENTS .......... 24

V.  ARGUMENT .................................................................................... 25

A.  The Settlement Should Be Approved ................................................ 25

1.  The Settlement Agreement Meets the Rule 23(e)(2) Factors ..................... 26

i.  Rule 23(e)(2)(A) – The Class Representative and Class Counsel Have
Adequately Represented the Classes ........................................... 27

ii.  Rule 23(e)(2)(B) – The Proposal Was Negotiated at Arm's-Length and With
the Assistance of an Experienced and Skilled Mediator .......................... 28

iii.  Rule 23(e)(2)(C) – The Relief Provided for the Class is Adequate ............ 29

(A) Rule 23I(2)(C)(i) – Avoiding the Costs, Risks, and Delay of Trial and
Appeal And Other Benefits to the Class from the Settlement ................... 30

1.  The Opportunity to Collect Interest on Late-Paid Bills. ................... 30

2.  Ease of the Claims Process. ............................................. 32

3.  Avoiding the Risks Inherent in Obtaining Class Certification and Appeals
Process. ................................................................ 33

4.  Avoiding the Risks Inherent in a Trial and Appeal. ...................... 35

5.  Avoiding the Costs and Delays of Litigation, Trial, and Appeal............ 35

6.  Payment of Plaintiff's Attorneys Fees by Defendants. ................... 36

(B) Rule 23(e)(2)(C)(ii) – Method of Distributing Relief to the Class ............. 36

(C) Rule 23(e)(2)(C)(iii) – Attorneys' fees .................................... 37

(D) Rule 23(e)(2)(C)(iv) - The Settlement Agreement ....................... 39

iv.  Rule 23(e)(2)(D) – The Settlement Treats Class Members Equitably
Relative to Each Other ...................................................... 39

v.  Class Certification........................................................ 40

1.  Numerosity........................................................... 40

2.  Commonality.......................................................... 40

3.  Typicality ............................................................ 41

4.  Adequacy ........................................................................................ 41

5.  Rule 23(b)(3)'s Predominance and Superiority Requirements ............ 42

**VI.  CONCLUSION** ...................................................................................... **43**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Int'l Group, Inc. v. ACE INA Holdings*,
    No. 07-2898, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ....................................................... 30

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591 (1997)................................................................................................................. 43

*Armstrong v. Board of School Directors of City of Milwaukee*,
    616 F.2d 305 (7th Cir. 1980) ............................................................................................ 25, 26

*Beesley v. Int'l Paper Co.*,
    No. 3:06-cv-703, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014) ................................................ 38

*Butler v. Am. Cable & Tel., LLC*,
    No. 09-cv-5336, 2011 WL 4729789 (N.D. Ill. Oct. 6, 2011) ................................................ 40

*Butler v. Sears, Roebuck & Co.*,
    727 F.3d 796 (7th Cir. 2013) ................................................................................................. 43

*Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*,
    897 F.3d 825 (7th Cir. 2018) ..................................................................................... 32, 37, 40

*Cook v. Niedert*,
    142 F.3d 1004 (7th Cir. 1998) ............................................................................................... 23

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ............................................................................................... 25

*Daluge v. Cont'l Cas. Co.*,
    No. 15-CV-297-WMC, 2018 WL 6040091 (W.D. Wis. Oct. 25, 2018) ........................... 32, 37

*Felzen v. Andreas*,
    134 F.3d 873 (7th Cir. 1998) ................................................................................................. 26

*Gehrich v. Chase Bank USA, N.A.*,
    316 F.R.D. 215, 229-230 (N.D. Ill. 2016) ............................................................................ 36

*Hale v. State Farm Mutual Auto. Ins. Co.*,
    2018 WL 6606079 (S.D. Ill. Dec. 16, 2018)..................................................... 26, 29, 39, 40

*Harris v. Chevron U.S.A., Inc.*,
    2019 WL 5846917 (W.D. Okl. July 29, 2019) ...................................................................... 28

*Holtzman v. Turza,*
    No. 08 C 2014, 2009 WL 3334909 (N.D. Ill. Oct. 14, 2009) .................................................. 42

*In re AOL Time Warner, Inc. Sec. Litig.,*
    2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ........................................................................ 28

*In re AT&T Mobility Wireless Data Sers. Sales Litig.,*
    270 F.R.D. 330 (N.D. 111. 2010) .................................................................................. 26

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,*
    80 F. Supp. 3d 838 (N.D. Ill. 2015) .............................................................................. 38

*In re Giant Interactive Grp., Inc. Sec. Litig.,*
    2011 WL 5244707 (S.D.N.Y. Nov. 2, 2011) ...................................................................... 28

*In re Southwest Airlines Voucher Litigation,*
    2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) .................................................................... 28

*In re Synthroid Mktg. Litig.,*
    264 F.3d 712 (7th Cir. 2001) ...................................................................................... 37

*Isby v. Bayh,*
    75 F.3d 1191 (7th Cir. 1996) ........................................................................... 25, 27, 36

*Keele v. Wexler,*
    149 F.3d 589 (7th Cir. 1998) ...................................................................................... 41

*Kolinek v. Walgreen Co.,*
    311 F.R.D. 483 (N.D. Ill. 2015) .................................................................................. 38

*Marque Medicos Fullerton, LLC v. Zurich Am. Ins. Co.,*
    83 N.E. 3d 1027 (Ill. Ct. App. 2017) ........................................................................... 8, 9

*McCue v. MB Financial, Inc.,*
    2015 WL 4522564 (N.D. Ill. July 23, 2015) ..................................................................... 28

*Messner v. Northshore Univ. Health Sys.,*
    669 F.3d 802 (7th Cir. 2012) ...................................................................................... 42

*Muro v. Target Corp.,*
    2005 WL 1705828 (N.D. Ill. July 15, 2005) ..................................................................... 40

*Officers for Justice v. Civil Serv. Comm'n,*
    688 F.2d 615 (9th Cir.1982) ....................................................................................... 26

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ........................................................................... 38

*Remijas v. Neiman Marcus Grp. LLC*,
    341 F.Supp.3d 823 (N.D. Ill. 2018) ................................................................. 35

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ......................................................................... 41

*Saltzman v. Pella Corp.*,
    257 F.R.D. 471 (N.D. Ill. 2009) ....................................................................... 41

*Smith v. Volkswagen Group of Am., Inc.*,
    No. 13-cv-0370-MJR, 2014 WL 12160767 (S.D. Ill. May 27, 2014) .................... 25

*Stull v. YTB Int'l, Inc.*,
    No. 08-cv-0565-NJR, 08-cv-0600-NJR, 2015 WL 13631334 (S.D. Ill. June 8, 2015) ........... 25

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ..................................................................... 26, 29

*Wong v. Accretive Health, Inc.*,
    773 F.3d 859 (7th Cir. 2014) ........................................................................... 28

**Statutes**

Illinois Workers' Compensation Act .... 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 16, 18, 31, 33, 34, 35, 41, 42

**Other Authorities**

*Newberg on Class Actions* § 11.41 (4th ed. 2002) ........................................... 30

Illinois Consumer Fraud Act ..................................................... 7, 9, 10, 35, 40, 41, 43

Illinois State Medical Society, Memorandum to the Illinois General Assembly .................. 6, 31

Manual for Complex Litig. § 21.62, n. 971 ........................................................ 23

Manual for Complex Litigation (Fourth), § 21.632 (2004) ........................................ 25

**Rules**

Fed. R. Civ. P. 23 ........................................ 23, 24, 25, 26, 27, 28, 29, 36, 37, 39, 40, 42

SDIL-LR 7.1(c)(2) ................................................................................... 10

Plaintiff Michael E. Beatty, M.D., P.C. ("Plaintiff") respectfully requests this Court grant final approval of the parties' Settlement Agreement ("Settlement"). Despite the deadline being almost two months away, Class Members have already begun submitting claims for cash payments for allegedly unpaid interest on late-paid medical bills (i.e., bills paid more than 30 days after receipt). Per the Settlement Agreement, the Class payments can total up to $10,000,000. This is an excellent outcome for the Class. Prior to this litigation, the Class had no recourse or opportunity to collect interest on late-paid medical bills despite such interest being mandated by statute. This problem loomed large in the healthcare industry for many years. Thus, it is no surprise that the Settlement has been well received by class members and the medical community alike. The Illinois State Medical Society says that "This is a big win for doctors and will help injured workers access timely medical care." Illinois State Medical Society, *Fairness for Illinois' Workers' Compensation System*: *Physician successfully sues for timely payment*, September 29, 2020 (attached as Exhibit 1). And WorkCompCentral reported that "doctors rejoiced at the news" of the settlement, quoting one class member as saying that it "sends a powerful message" and that "it's a big day for physicians and [] injured workers." WorkCompCentral, *Comp Insurers Agree to Settle Doctors' Class Action for $10 Million*, September 30, 2020 (attached as Exhibit 2). Indeed, the reaction of the class to this settlement, with no objections (even in this era of professional class action settlement objectors) and less than 30 opt outs in a class of over 8,000 members shows beyond doubt that the class views this settlement as fair, reasonable and adequate. Accordingly, Plaintiff requests that this Court approve the Settlement.

1

## I.    INTRODUCTION

The proposed Settlement is fair, reasonable, and adequate.  It is the product of many months of extensive, hard-fought, arms-length negotiations between counsel for Plaintiff and Defendants.[1]  With the assistance and guidance of the Honorable Wayne Andersen as mediator, the parties engaged in a two-day, in-person mediation followed by countless phone conferences and emails between the parties as well as many communications with and through Judge Andersen.  The Court should grant final approval because the Settlement provides substantial monetary relief to the Class and avoids the inherent risks, delays, and expense associated with protracted class action litigation.  As explained below, the terms are consistent with applicable case law and easily satisfy all applicable criteria for preliminary approval.

Each Class Member making a valid claim will receive a cash payment subject to Defendants' right to contest that the Class Member is not entitled to payment.  To summarize, that payment will amount to 50% of interest on claims paid between 31 and 120 days after

---

[1] Accident Fund General Insurance Company; Accident Fund Insurance Company of America; Accident Fund National Insurance Company; Acuity, a Mutual Insurance Company; American Compensation Insurance Company; American Zurich Insurance Company; Amerisure Mutual Insurance Company; Auto Owners Insurance Company; Berkshire Hathaway Homestate Insurance Company; Broadspire Services Inc.; Cannon Cochran Management Services, Inc.; Constitution State Services, LLC; Chubb Indemnity Insurance Company; Commerce and Industry Insurance Company; Continental Casualty Company, Inc.; American Casualty Company Of Reading Pennsylvania; Country Mutual Insurance Company; Creative Risk Solutions, LLC; ESIS, Inc; Federated Mutual Insurance Company; Fireman's Fund Insurance Company; First Liberty Insurance Corporation; General Casualty Company of Wisconsin; Gallagher Bassett Services, Inc; Hartford Accident & Indemnity Company; Hartford Casualty Insurance Company; Hartford Fire Insurance Company, Inc.; Hartford Insurance Company of Illinois; Hartford Insurance Company Of The Midwest; Hartford Underwriters Insurance Company; Illinois National Insurance Co.; Indemnity Insurance Company of North America; The Insurance Company of The State of Pennsylvania; Liberty Mutual Insurance Company; New Hampshire Insurance Company; Old Republic Insurance Company; PMA Companies; Pekin Insurance Company; QBE Insurance Company; Sedgwick Claims Management Services, Inc.; Sentry Casualty Company; Synergy Insurance Company; Travelers Property & Casualty Company of America; Tristar Insurance Group, Inc; Zurich American Insurance Company

receipt by the Carrier Defendant or the TPA Defendant (where that TPA Defendant handled the claim on behalf of an insurance carrier and not a self-insured employer), 35% of interest on claims paid between 31 and 120 days after receipt by the TPA Defendant where the TPA Defendant handled the claim on behalf of a self-insured employer, and 15% of interest on claims paid in excess of 120 days after receipt by the Carrier Defendant or TPA Defendant.

Defendants' payments to the Class can total up to $10 million—a cap that is very unlikely to be exceeded and includes a $500,000 floating amount in the event accepted claims exceed a Defendant(s)' individual cap.  The benefits to the Class are enhanced because Class Members will receive their payments with no deduction for attorneys' fees, legal expenses, settlement administration expenses, or class representative service payments.  Such fees and costs will be paid separately.

Negotiating and structuring a settlement of this case was particularly challenging given the number of Defendants, Defendants' various defenses, the different roles and business models of the different Defendants, the disparity in size and potential liability exposure between Defendants, evolving legislation, and disputes among the Defendants about which entity is to pay the interest if interest must be paid (see, e.g., Doc. 473).

This is a fair and reasonable settlement that provides substantial benefits to the Class as well as the entire Illinois healthcare system.  Illinois healthcare providers who otherwise had no opportunity to collect interest on unpaid bills can now recover unpaid interest.  And, as the Illinois legislature and Illinois courts have made clear, the interest mandate in the Illinois Workers' Compensation Act (802 ILCS 305/4) ("IWCA") was added to the law to ensure three public policy goals:  (1) lower prices, (2) access to quality healthcare, and (3) prompt, certain payment of benefits.  These public policy goals have not been met.  To the detriment of the

3

Illinois healthcare system, the interest mandate did not result in all statutorily-mandated interest being paid. This lawsuit helped solve the problem. Not only did this lawsuit allow the Class an opportunity to collect past unpaid interest, it caused certain Defendants to change their internal processes and procedures relevant to this issue and, for certain other Defendants, it expedited and informed changes to their internal processes and procedures that were underway.

Because of this lawsuit and settlement, the above public policy goals will now be met going forward and Illinois' healthcare providers with valid, approved claims will receive payment for interest owed on past late payments. Prior to this litigation, the Class had only very difficult and ineffective enforcement mechanisms to recover interest on an individual basis. The IWCA did not, at the time this Action was filed, provide an enforcement mechanism or a private cause of action on behalf of a medical provider to recover interest on late-paid claims. Defendants, the Illinois government, and Illinois' healthcare providers interpreted the interest payment obligations under the IWCA differently. While the IWCA unambiguously required healthcare providers to be paid interest, there was no enforcement mechanism for the providers to collect the interest and there was disagreement concerning who owed the interest. Indeed, this Court held that "the [IWCA] statute is ambiguous." Doc. 269 at 8. For various reasons, interest was not being paid on some late-paid medical bills. Now, if this settlement is approved, providers will finally collect past interest.

## II.    BACKGROUND

In 2005, the Illinois legislature enacted comprehensive reform to the IWCA. One of the chief features of the new legislation was the adoption for the first time of a comprehensive fee schedule for medical providers, 820 ILCS 305/8.2. The legislature also adopted what is commonly referred to as a "prompt pay" provision to ensure that medical providers would be

paid within 60 days of receipt of their bill and, in the event of nonpayment within that time,

providers would receive interest at the rate of 1% per month on late paid bills, 820 ILCS

305/8.2(d), eff. July 20, 2005.

Specifically, Section (d) provided that "…the bill…shall incur interest at a rate of 1% per

month **payable to the provider**." *Id.* (emphasis added). The legislature clearly expressed its

intent that "the provider" is to be the recipient of the interest in the IWCA's interest provision.

That comports with common sense because the provider is financially "injured" as a result of late

payments. The direct payment of interest to providers was a sea change in the statutory scheme

of the Act.

In 2011, the legislature amended the Act, partially in response to the perception that

Illinois was becoming less competitive due to the high cost of workers' compensation insurance.

Pertinent here, the legislature reduced medical reimbursements due under §8.2 by 30% across the

board. To partially make up for the diminished reimbursements, the legislature reduced the time

for payment of medical bills from 60 days to 30 days and for payment of interest on bills paid

after that time, §§8.2(d)(1) & (3), eff. June 28, 2011. Unfortunately, when the legislature

enacted the late pay and interest provisions, it failed to enact any enforcement mechanism in the

IWCA for the healthcare providers to recover the interest.

The Illinois State Medical Society sent a Memorandum to the General Assembly in 2015

pointing out this enforcement deficiency in the IWCA, stating:

> The 2011 reform [to the IWCA] appeared to provide some relief to physicians who
> do not receive payments for approved medical treatment for workers' compensation
> patients. However, the reform legislation simply changed an apparent "right" for
> physicians that has no enforceability.
> …
>
> The 2011 reform decreased the time period for the collection of interest on unpaid
> bills from 60 to 30 days, apparently as an effort to provide relief for medical

5

> providers who have not been paid for their services to workers' compensation patients.  However, there is no way that medical providers can enforce this provision at the Commission.  While the Department of Insurance issued a bulletin to insurers and third party administrators to advise them of their "duty" to comply with this legislative mandate, the bulletin simply directed any questions to the general information email address for the Workers' Compensation Commission. The 2011 reform contained an even emptier promise for Illinois physicians, making a change to a "right" which has no "remedy" in workers' compensation cases.

Illinois State Medical Society, Memorandum to the Illinois General Assembly, May 4, 2015 (attached as Exhibit 3) at 7 (ISMS Mem., May 4, 2015) (stating that the IWCA provides "a 'right' which has no 'remedy'" and calling the 2011 reform to the IWCA an "empt[y] promise").

Plaintiff alleges that the Defendant insurance companies and TPAs have often ignored their statutorily mandated obligation to pay interest on late paid bills.  Plaintiff alleges they have done so in spite of the IWCA and being advised by the Illinois Department of Insurance of their obligations: "NOTIFICATION TO MAINTAIN COMPLIANCE WITH THE INTEREST PROVISIONS CONTAINED IN 820 ILCE 305/8.2(d)(3).  The purpose of this bulletin is to advise all insurance companies and claims administrators who adjust workers' compensation claims in Illinois of their duty to comply with the aforementioned statutory requirements."  Doc. 244-2.  Defendants have disputed these allegations.

Plaintiff sought legal advice from his undersigned attorney, Robert H. Wendt ("Wendt") in 2016 regarding the late payment of bills resulting from treatment of patients covered by the IWCA.  After initial research concerning §8.2(d)(3), Wendt believed that statutory interest was owed to Plaintiff and other providers, but the Act failed to provide any enforcement mechanism to collect it.  Thereafter, Wendt conducted extensive research to determine if there was any remedy available to Plaintiff, because Plaintiff could not bring a direct action under the IWCA. Two potential strategies were third party beneficiary or implied cause of action theories of recovery, but those were previously attempted and rejected in other cases.  Finally, it was

6

concluded that a viable cause of action could be maintained under the "unfair practice"
provisions of the Illinois Consumer Fraud Act ("ICFA") – a strategy and cause of action that no
attorney or healthcare provider had ever attempted related to the IWCA and unpaid interest.

Once it was determined that Plaintiff may be able to maintain an ICFA claim, Wendt
reviewed an untold number of Plaintiff's medical charts to determine the extent of the interest
problem.  That review revealed that Plaintiff was regularly not paid interest due under the statute.
This realization, along with the understanding that countless other providers across Illinois
suffered the same problems as Plaintiff, resulted in the present lawsuit alleging that failure to pay
interest constitutes an unfair practice under the ICFA.

## A.  The Pleadings

### 1.  Plaintiffs' Claims

Plaintiff brought this action to seek redress for the Defendants' alleged failure and refusal
to pay interest under the IWCA.  Plaintiff, motivated by the belief that Defendants' alleged
practices are detrimental to the health of Plaintiff's patients and to the welfare of the general
public, brought this action on behalf of all similarly situated physicians and healthcare providers.
Plaintiff alleged that Defendants' actions forced the healthcare providers to finance their
treatment and deprive them of adequate and timely payments, which are needed to maintain their
practices and continue rendering services to Illinois citizens, particularly patients covered by the
IWCA.

When this case was filed in 2017, Section 8.2(d)(3) of the IWCA stated:

(d) When a patient notifies a provider that the treatment, procedure, or service being
sought is for a work-related illness or injury and furnishes the provider the name
and address of the responsible employer, the provider shall bill the employer
directly.  The employer shall make payment and providers shall submit bills and
records in accordance with the provisions of this Section.
…

(3) In the case of nonpayment to a provider within 30 days of receipt of the bill which contained substantially all of the required data elements necessary to adjudicate the bill or nonpayment to a provider of a portion of such a bill up to the lesser of the actual charge or the payment level set by the Commission in the fee schedule established in this Section, the bill, or the portion of the bill, shall incur interest at a rate of 1% per month payable to the provider.  Any required interest payments shall be made within 30 days after payment.

Section 4(a)(3) of the IWCA states: "Every policy of an insurance carrier, insuring the payment of compensation under this Act shall cover all the employees and the entire compensation liability of the insured."

The IWCA does not provide a private cause of action by healthcare providers to recover interest.  While courts have subject-matter jurisdiction to hear claims by providers against insurers related to the IWCA, providers have no direct or implied right of action to bring an IWCA claims.

Prior to this litigation, healthcare providers have attempted to bring various claims to collect unpaid interest.  None succeeded.  For example, in *Marque Medicos*, "the plaintiff medical providers sued the defendant insurance companies for making untimely payments without also paying interest."  Doc. 269 at 10 (citing *Marque Medicos Fullerton, LLC v. Zurich Am. Ins. Co.*, 83 N.E. 3d 1027, 1033 (Ill. Ct. App. 2017).  "The plaintiff providers based their complaint on the theory that the IWCA's interest provision was incorporated into the standard insurance policies issued by defendants.  The plaintiff providers then claimed they were third-party beneficiaries of those contracts between insurers and employers … and that defendants breached an implied-in-fact contract."  *Id.* (citing *Marque Medicos*, 83 N.E 3d at 1033).  The *Marque Medicos* court found that the plaintiff providers were not third-party beneficiaries, defendants had not breached any implied-in-fact contracts, and plaintiffs had no private right of action under the IWCA.  *Id.* at 10-11.

8

For many years, the Illinois healthcare industry had attempted to recover the interest but failed.  For example, as far back as 2014, the Illinois Workers' Compensation Commission held a medical fee advisory board meeting in which the interest requirement of Section 8.2(d) was discussed because "[a]n issue has arisen regarding the apparent lack of an enforcement mechanism for the Commission to order this one percent to be paid."  Doc. 248-1 at 1.  The industry and the Commission knew that the IWCA's legislative purpose and goals were not being fulfilled, but nobody could find a way to accomplish those goals and have the purpose fully carried out statewide.  Then, Plaintiff brought this lawsuit.

Plaintiff's counsel was the first to bring a claim under the Illinois Consumer Fraud Act ("ICFA") to recover the unpaid interest.  Specifically, Plaintiff claims that the Defendants' failure to pay interest is an unfair practice under the ICFA.  Unlike *Medicos*, Plaintiff did not bring a cause of action under the IWCA.  Defendants filed numerous motions to dismiss, motions for reconsideration, and motions for summary judgment.  Among other arguments, Defendants argued that Plaintiff did not have standing to bring an ICFA claim and Defendants had no obligation or duty to pay interest under the IWCA.

### 2.  The Defendants' Counterclaims

In June and July 2019, Defendants filed answers, affirmative defenses, and (in the case of some Defendants) counterclaims for declaratory judgment alleging that the TPA Defendants have no duty to pay statutory interest to Plaintiff or other similarly situated medical providers.  Doc. 433, 446, 451-453, 473.  Plaintiff moved to dismiss or strike the counterclaims.  Doc. 474-478, 484.

### B.  The Course of This Litigation

From the beginning, this lawsuit has been vigorously contested.  Various motions to dismiss were filed by both sides as well as motions to reconsider, motions for summary

9

judgment, and discovery motions.  The case was filed in September 2017.  Due to the extensive motion practice and amended complaints, it took nearly two years before Defendants filed answers to the Second Amended Complaint.  Evidencing the hard fought nature of this litigation, at every opportunity, Defendants filed reply briefs in support of the various motions to dismiss, for summary judgment, and for reconsideration even after consideration of this Court's Local Rule stating "**Reply briefs are not favored and should be filed only in exceptional circumstances.**" SDIL-LR 7.1(c)(2) (emphasis in original).

### 1.  Motions to Dismiss

On December 15, 2017, Defendants filed a joint motion to dismiss Plaintiff's class action complaint.  Doc. 224.  Defendants' arguments included that "insurers and TPAs have no obligation to pay interest under IWCA section 8.2(d)," "medical providers have no standing under the IWCA to sue insurers and TPAs," and "Beatty's ICFA claim, which represents the latest in a long line of failed efforts by medical providers to manufacture direct claims against insurers, likewise should be dismissed under well-established ICFA precedent."  Doc. 224 at 1-2.

Also on December 15, 2017, Defendants filed an omnibus motion to dismiss based on the statute of limitations and memorandum in support.  Doc. 218, 219.  Additionally, individual memoranda in support of the motion to dismiss were filed by various Defendants including Accident Fund General Insurance Company, Accident Fund Insurance Company of America, Accident Fund National Insurance Company, Country Mutual Insurance Company, The First Liberty Insurance Corporation, and Synergy Insurance Company.  Docs. 217, 220-222, 226-228, 230-233, 238.  On December 22, 2017, Defendant Tristar Insurance Group filed a separate motion to dismiss.  Doc. 239.  Plaintiff responded to the various motions to dismiss.  Docs. 247, 248.  Defendants filed replies.  Docs. 251-253.  On March 5, 2018, the Court stayed discovery pending resolution of the motions to dismiss.  Doc. 260.

On July 2, 2018, the Court issued a Memorandum and Order addressing the above motions to dismiss. Doc. 269. The joint motion to dismiss the complaint was denied, the motion to dismiss based on the statute of limitations was granted in part and denied in part, and Defendant Tristar's motion to dismiss was denied. Doc. 269 at 1. The Complaint was dismissed, however, and Plaintiff was granted leave to amend. *Id.* at 32. With respect to whether Defendants have a duty to pay interest under the IWCA, the Court stated: "When reading these provisions together [Sections 8.2(d) and 4(a)], the language of Section 8.2(d) requiring an 'employer' to make payment becomes ambiguous." Doc. 269 at 8. "Because the statute is ambiguous, the Court turns to the purpose and necessity for the law and the goals sought to be achieved. In this case, the purpose of the IWCA in general and Section 8.2(d) specifically is to promptly compensate employees for their injuries." Doc. 269 at 8-9. "To effectuate that goal, if an employer has insured its workers' compensation liability in an insurer, then the *insurer* must be responsible for any interested accrued on late payments. An insurance company that believes only the *employer* is responsible for paying interest has no motivation to pay on time, thereby defeating the purpose of the IWCA and rendering the interest provision inconsequential." *Id.* at 9 (emphasis in original). The Court "determined that insurers have a duty to pay interest under the IWCA…." Doc. 269 at 14.

After Plaintiff amended its Complaint, on September 7, 2018, Defendants filed a joint motion to dismiss Plaintiff's Second Amended Complaint. Doc. 295. Also on September 7, 2018, Defendants filed an omnibus partial motion to dismiss the Second Amended Complaint based on the statute of limitations. Doc. 296. Supplemental briefs to the September 7, 2018 omnibus partial motion to dismiss were filed by various defendants including Commerce and Industry Insurance Company, Illinois National Insurance Company, The Insurance Company of

11

the State of Pennsylvania, and Pekin Insurance Company, Accident Fund General Insurance

Company, Accident Fund Insurance Company of America, Accident Fund National Insurance

Company, American Casualty Company of Reading, Pennsylvania, American Zurich Insurance

Company, Cannon Cochran Management Services, Inc., Continental Casualty Company,

Country Mutual Insurance Company, First Liberty Insurance Corporation, and Zurich American

Insurance Company.  Docs. 297, 304, 298, 302, 305, 306, 307, 308.  Plaintiff responded to these

various motions to dismiss the second amended complaint on October 9, 2018.  Doc. 341, 342,

344.

On June 7, 2019, the Court ruled on the motions to dismiss the Second Amended

Complaint based on the statute of limitations and on Country Mutual, Federated, and Cannon

Cochran's motions for summary judgment.  Doc. 420.  The Court found "that Beatty has

sufficiently pleaded fraudulent concealment under Rule 9(b)."  *Id.* at 8.  The Court held that

"[a]ny arguments on the statute of limitations would be better suited for the summary judgment

stage."  *Id.*  The Court denied the summary judgment motions without prejudice and stated that

"Defendants are free to refile their motions for summary judgment after discovery has

concluded."  *Id.* at 9.

It should be noted that Defendants continue to assert that all these grounds are legally

valid.  Among other items, Defendants also continue to assert: 1) that the plain language of the

statute required employers—not insurers—to pay interest; 2) that there was in fact no obligation

to pay interest in the manner requested by Plaintiff; and 3) that no valid action exists for Plaintiff

to enforce any such obligation.  Defendants had made known to Plaintiff's counsel that they

intended to vigorously contest every ruling in this litigation on appeal to the Seventh Circuit

absent a class action settlement.  The uncertainties and costs associated with any such appeal, as

well as the time delays to the class recovery such appellate practice would engender, further informed Plaintiff's counsel's decision to enter into this settlement.

### 2. Motions for Reconsideration and Interlocutory Appeal

On July 30, 2018, the Defendants filed a motion for reconsideration of the Court's July 2, 2018 Order or, in the alternative, for certification for interlocutory appeal. Doc. 275. On the same date, the TPA Defendants filed another separate motion for reconsideration or, in the alternative, for certification for interlocutory appeal. Doc. 274. Defendants argued, among other things, that this Court's ruling that the IWCA was "ambiguous" itself defeated the ICFA claim. Defendants cited case law that they believe supports the proposition that no ICFA claim can be predicated on an ambiguous statute. Plaintiff responded to each motion for reconsideration / interlocutory appeal, and the Defendants filed replies. Doc. 280, 281, 287, 288. On March 18, 2019, the Court issued a Memorandum and Order denying the Defendants' joint motion for reconsideration and the TPA Defendants' motion for reconsideration. Doc. 411.

### 3. Motions for Summary Judgment

On September 7, 2018, Defendant Country Mutual Insurance Company filed a motion for summary judgment based on the statute of limitations. Docs. 302, 303. Plaintiff responded on October 9, 2018. Doc. 342. Defendant filed a reply on October 23, 2018. Doc. 353.

On October 31, 2018, Defendant Federated Mutual Insurance Company filed a motion for summary judgment based on the statute of limitations. Doc. 356. Plaintiff responded on December 10, 2018. Doc. 387. Federated replied on December 27, 2018. Doc. 396.

On November 20, 2018, Defendant Cannon Cochran Management Services, Inc. filed a motion for summary judgment. Doc. 367. Plaintiff responded on December 20, 2018. Doc. 392. Cannon Cochran replied on January 17, 2019. Doc. 405.

Plaintiff filed motions to deny or defer considering the summary judgment motions.

Docs. 343, 385, 391.  Plaintiff's motion was granted on June 7, 2019.  Doc. 420.  The Court

denied the summary judgment motions without prejudice and stated that "Defendants are free to

refile their motions for summary judgment after discovery has concluded.  *Id.* at 9.

### 4.  Motions to Dismiss Defendants' Counterclaims

On August 21, 2019, Plaintiff filed motions to dismiss or strike the counterclaims of

Defendants Broadspire, Cannon Cochran, ESIS, Inc., Gallagher, Sedgwick Claims Management,

and Tristar.  Docs. 474-478, 484.  Defendants responded to the motions to dismiss on September

26, 2019.  Docs. 490-495.  The Court did not rule on these motions, which were outstanding

when the parties informed the Court that the parties had reached an agreement in principle to

settle this litigation.

### 5.  Discovery

Initial disclosures were exchanged in January 2018.  Magistrate Judge Wilkerson held a

Scheduling Conference in January 2018.  Doc. 249 at 1.  The parties disagreed about the scope of

discovery on the issue of class certification.  *Id.* at 1-2.  Defendants requested extensive

discovery and were granted "a substantial amount of discovery."  *Id.* at 2.  For example,

Defendants requested 1,100 interrogatories and 142 hours of deposition of the Plaintiff.  The

Court allowed 490 interrogatories and 35 hours of deposition of Plaintiff.  *Id.* at 2.  Written

discovery was exchanged in February 2018 after the Magistrate Judge denied Defendants'

motion to stay discovery pending ruling on Defendants' motions to dismiss.  *See* Doc. 249.

Defendants appealed the Magistrate Judge's decision, and discovery was later stayed on March

5, 2018 pending resolution of the Defendants' motions to dismiss.  Doc. 260.  The Court lifted

the stay on July 31, 2018 after ruling on those motions to dismiss.  After lifting the stay, an

Amended Scheduling and Discovery Order was entered.  Doc. 277.  The parties exchanged

14

responses and supplemented responses to written discovery at various times in 2018 and 2019. Many extensive in-person and telephonic meet and confers involving dozens of attorneys were held. Defendants' production focused largely on spreadsheets that summarized certain information about bill payments and interest payments. The written discovery as well as the many meet and confers proved valuable in leading the parties to mediation.

### 6. Mediation

This settlement results from a lengthy mediation process. The mediation initially took place in Chicago, lasted two full days, and concluded with a counter-offer and promises to continue the discussions and negotiations. The parties selected the Honorable Wayne Andersen, former United States District Judge of the United States District Court for the Northern District of Illinois and former Judge in the Circuit Court of Cook County, as the neutral in large part due to his extensive experience with class actions. The parties' mediation before Judge Andersen was on April 30 and May 1, 2019. The parties' discussions and negotiations continued throughout most of the year. In late 2019, the parties agreed to a Term Sheet. In late 2019 and early 2020, the parties negotiated and finalized the Settlement Agreement.

As detailed in the Declaration of Judge Andersen, he was regularly updated and involved from his retention in March 2019 throughout these extensive settlement negotiations. W. Andersen Decl. (attached as Exhibit 4). Preparing for the mediation, Judge Andersen states:

> I asked the Parties to provide me with a variety of information about the lawsuit. The information provided me with the facts giving rise to the dispute, the procedural background of the lawsuit, and the positions of the Parties. I reviewed the decisions of this Court issued in the case, the Parties' motions and supporting legal memoranda, and other related materials. I also reviewed lengthy pre-mediation statements prepared by the Parties. I became intimately familiar with the nature of the claims and defenses asserted in this case.

Exh. 4 at ¶ 5. Regarding the months-long negotiation process, Judge Andersen states:

15

> [T]he extended process by which the Parties negotiated a class-wide settlement involved in-person discussions with all counsel, extended sessions with each side, bi-lateral discussions with counsel, and ex-parte discussions with the Parties concerning their various positions. The discussions allowed the Parties to fully express their respective views of the strengths and weaknesses of their respective positions in the case. The Parties exchanged offers and counteroffers and negotiated their positions vigorously. I never witnessed or sensed any evidence of collusion between the Parties. To the contrary, at each point during these negotiations, the settlement process was conducted professionally and at arm's-length. The Parties were always adversarial.

*Id.* at ¶ 15. Regarding the settlement and resolution, Judge Andersen states:

> In my opinion, the settlement negotiations in this case resulted in a resolution that is fair, reasonable, and adequate for the Class Members. The settlement is a fair and non-collusive settlement that was conducted at arm's-length by skilled, well-informed lawyers. Through this settlement, counsel for the Class has obtained for Class Members valuable benefits that are fair, reasonable, and adequate.

*Id.* at ¶ 17.

### III.    THE SETTLEMENT AGREEMENT

During and after the mediation, the parties engaged in arm's-length negotiations over the terms of a formal Settlement Agreement ("Sett. Agrt."). This Settlement Agreement is attached hereto as Exhibit 5 pursuant to Rule 23(e)(3). Here is a summary of its most important terms.

#### A. The Class

The Class is defined as:

> [A]ll Illinois physicians and/or healthcare providers who (i) submitted an invoice for reimbursement of services in connection with the treatment of an employee covered by the provisions of the IWCA to a Defendant (or its agent) that was paid from August 19, 2014 through the date of Preliminary Approval (as defined below); (ii) were paid more than thirty (30) days after the invoice was received by the Defendant (or its agent); and (iii) were not paid any interest on that invoice, but excludes Person meeting the foregoing criteria who timely exclude themselves from the Class.

> While any Illinois Physician and/or Healthcare Provider may be a Class Member based on the criteria set forth above, no Class Member can submit claims handled by any Defendant on behalf of

the State of Illinois.  Such claims are excluded from this
Settlement.

Sett. Agrt. ¶¶ 42-43.

Physicians and healthcare providers may opt out of the Class, in which case they will not
be bound by any orders or judgments in this case and not be affected under the Settlement
Agreement.  Those who opt out will also not release any claims by virtue of the Settlement
Agreement.  *Id.* at ¶¶ 41, 65-67.

**B.  Monetary Relief for the Classes**

Subject to a damages cap and on a claims-made basis, the Defendants will pay Class
Members up to $10 million as described in Sections III, XV, and XVI of the Settlement
Agreement.  Payment of class remedies will be made on a claims-made basis and on the basis of
valid Claims Forms.  *Id.* at ¶ 44.  Payments will be based on Defendants' Claims Data (Section
VI), supplemental information provided by Members of the Class, and information submitted on
and with the Class Members' Claims Forms (Section III, Appendix A).  The specific remedies
afforded the Class are described in Section III, Paragraph 45.  There are three different categories
of remedies:  (a) 50% of interest for claims related to invoices paid between 31 and 120 days
after receipt and were administered by or on behalf of an insurance carrier, (b) 35% of interest
for claims related to invoices paid between 31 and 120 days after receipt and were administered
by a TPA that is a defendant in this action on behalf of a self-insured employer, and (c) 15% of
interest for claims related to invoices paid in excess of 120 days after receipt.  Sett. Agrt. ¶ 45.

The varying reimbursement rates reflect the parties' negotiations related to the various
strengths and weaknesses in Plaintiffs' claims and Defendants' defenses.  In all scenarios,
reimbursement is less than 100% because of the significant chance that this case would not yield
any recovery for Class Members due to substantive or class-certification rulings by this Court or

17

the Seventh Circuit.  This case involves issues of first impression, and it is not inconceivable that

this Court or the Seventh Circuit would ultimately dismiss the case or deny certification of the

class Plaintiff seeks.  The amount of reimbursement changes depending on the nature of more

specific defenses Defendants could raise with respect to particular claims.  Under the IWCA, for

any provider invoice to be paid the invoice must have all the data necessary for the provider or

its TPA to make payment.  Information is sometimes lacking and hence provider bills are often

rejected for that reason.  But, an analysis of data reveals that, generally, the shorter the period of

time is between (i) the thirty days to pay a claim under the IWCA and (ii) the time payment is

made, the more likely it is that the invoice was paid late due to what Defendants have explained

to be human, electronic or administrative error.  In such cases, the Defendants' factual defenses

to the late payment are less strong, though there are still numerous plausible good faith bases for

the late payment, resulting in a significant 50% reimbursement.  For self-insured employers,

there is the additional legal and factual issue of whether the insurer, which is not actually

administering the claim, bears any legal responsibility to pay interest.  Given this uncertainty,

and the TPAs' promise to vigorously litigate this issue including on appeal if necessary, there

was a clear possibility that each self-insured employer might have to be made a defendant to the

case, which is impractical and could result in the denial of any class relief (given the huge

number of self-insured employers and the difficulty in identifying all of them).  For this reason,

these claims are reimbursable at 35%.  For invoices paid after 120 days, Plaintiffs' claims are at

their nadir, and Defendants' defenses are at their zenith.  The data reveals that, if a claim is paid

that late, there is more likely to be some factually-intensive issue, such as an incomplete invoice,

a disputed claim, a filed workers' compensation claim, or a settlement.  And, Defendants raised

language in the statute which they contend establishes that no interest is owed where a claim

results in a proceeding before the Workers' Compensation Board resulting in an award or

settlement.  Given the potential defenses to such claims, and the potentially fact-intensive issues

associated with such claims, these claims, which are expected to be the fewest in number, are

reimbursable at 15%.  This is an excellent result for the class because, absent a settlement, there

was a significant chance that such claims would never result in compensation.

The payments are subject to a cap of $10 million.  *Id.* at ¶ 106.  The Defendants'

individual caps, which total $9,500,000, are based upon "the percent of that Defendant Group's

liability exposure of the total liability exposure of all Defendants as determined by the

Defendants' Claim Data.  For example, if the total liability exposure of all Defendants based on

Defendants' Claim Data is $1,000,000, and Defendant Group X's Claim Data is $25,000, then

Defendant Group X's Individual Cap would be $237,500 [.025% of $10,000,000]."  *Id.* at ¶ 107.

The remaining $500,000 of the $10,000,000 payment cap is a floating amount that shall be

allocated to any Defendant Group where valid claim payments owed exceed the Defendant

Group's Individual Cap.  *Id.* at ¶ 108.  In the extremely unlikely event that the claims exceed the

$10 million cap, then individual payments to the affected Class Members will be reduced pro

rata so that the pay-out to the Class will not exceed $10 million.  *Id.* at ¶ 109-110.

Moreover, it should be stressed that this settlement covers dozens of insurance carriers and

TPAs, including affiliates of the named defendants *who were not sued in the case*.  Structuring a

settlement with uniform benefits across multiple Defendants with varying business practices,

policies and data systems required a Herculean effort on the part of Class Counsel, Defendants'

counsel and the Mediator.  Although the case involves many different Defendants, the settlement

permits for a uniform claim form for all Defendants, and a uniform set of benefits, allowing for

easy claiming-in by Class Members.  What's more, Class Counsel has secured benefits for the

Class well beyond what was even sought in the Complaint, as Class Counsel fought hard to

expand the settlement beyond the named parties to literally dozens of affiliated entities who,

absent this settlement, would have no liability whatsoever because they are not parties in the

case.

### C.  Exclusion from The Class And Release of Claims

Any potential Class Member may exclude himself, herself, or itself from the Class.  *Id.* at

§ VIII, ¶ 65.  All potential Class Members who do not exclude themselves will not be excluded

and will be bound by all subsequent proceedings, judgments, and orders in this action.  *Id.* at ¶

67.  "Any potential Class Member who initiates litigation, arbitration, or other proceedings

before or after the Court preliminarily approves this Settlement must request exclusion using the

Exclusion Form in a timely manner or else be bound by this Settlement."  *Id.*  The potential Class

Members who do not exclude themselves release the Released Persons with respect to the

Released Claims.  *Id.* at § XI, ¶¶ 77-78.

### D.  The Notice Program

The parties have chosen Epiq Class Action & Claims Solutions ("Epiq") to serve as the

Claims Administrator.  Epiq is highly experienced in class action settlement notice and

administration.  *See* https://www.epiqglobal.com/en-us/experience/class-action-mass-tort/class-

action-administration (accessed Feb. 7, 2020).

As described in Section VII of the Settlement Agreement, the most recent contact

information for potential Class Members in the Defendants' possession was used to provide

regular mail notice within ninety (90) days after Preliminary Approval.  Sett. Agrt. ¶ 58.  In

addition, publication notice was provided, and settlement documents are available on a website.

*Id.* at ¶¶ 61-62.  Class Notice conformed to all applicable requirements of the Federal Rules,

United States Constitution, and the Local Rules of this Court.  *Id.* at ¶ 63.  The Post Notice

Package, which included the forms attached as Appendices A, B, and D to the Settlement

Agreement, informed the Class of – among other items and information – the nature of the

lawsuit, the class definition, background information, the claim form, exclusion form,

instructions, Class Administrator's contact information, and class counsel's contact information.

*Id.* at ¶ 59-61.  The Publication Notice is the Class Notice published pursuant to the Publication

Notice plan, and the Publication Notice Form is attached as Appendix C to the Settlement

Agreement.  *Id.* at ¶ 62.  The Notices explained the binding effect of the settlement on Class

Members who are not excluded and that the Class Member (a) may enter an appearance through

an attorney, (b) will be excluded upon request (and the time and manner requesting exclusion),

and (c) how to object to the settlement.  Additionally, the Notices apprised Class Members of

what they can receive, how and when to make a claim, and the date and location of the final

fairness hearing.  Sett. Agrt., Appx. B.  Defendants are paying all costs associated with providing

the Class Notice including but not limited to the fees of the Claims Administrator.  *Id.* at ¶ 64.

### E.  Opt-Outs and Objections

As stated above, any potential Class Member was given the option to exclude himself,

herself, or itself from the Class.  *Id.* at § VIII, ¶ 65.  The Claims Administrator maintained a list

of all potential Class Members that timely provide Exclusion Forms (the "Opt-Out List").  The

procedures for objecting are in Section IX of the Settlement Agreement.  Any Class Member

who wants to object to the Settlement may do so no later than 30 days prior to the Fairness

Hearing (or as the Court may otherwise direct).  *Id.* at ¶ 68.

### F.  The Claims Process

To recover, a Class Member must mail a Claim Form (Appendix A) by first-class mail

along with any required supporting documentation as explained in Section XII of the Settlement

Agreement.  *Id.* at ¶ 81-84.  The Claim Form must be postmarked no later than 45 days after the

date of the Fairness Hearing.  *Id.* at ¶ 81.  The Claim Form will be mailed to Class Members and
will be available on the settlement website and will require that Class Members set forth their
name, address, contact information, and taxpayer identification number (for tax reporting
purposes).  *Id.* at ¶ 84.  At its discretion, a Defendant may choose to make claim determinations
itself or delegate some or all of its right to make claim determinations to the Claims
Administrator.  *Id.* at ¶ 85.  The Claims Administrator or Defendant will determine whether a
Claim Form contains the requisite information and will send a Deficiency Notice to Class
Members from whom additional information is required.  *Id.*   Class Members will have 30 days
from the date of the postmark on the Deficiency Notice to cure or provide additional information
depending on the type of claim and the reason for the Deficiency Notice.  *Id.*  Within 120 days
following the due date for the last Class Member to respond to a Deficiency Notice, the Claims
Administrator will send letters to all Class Members who submitted Claim Forms.  *Id.*  at ¶ 87.
Each Determination Letter will advise the Class Member of its right to object to the
determination (whether the payment amount or a denial) and will set forth the requisite data that
must be contained in any such objection (as set forth in Section XIV).  *Id.* at ¶ 87-91.  Following
Preliminary Approval and no later than the time Determination Letters are mailed, a Neutral
Evaluator will be selected to finally determine any disputes regarding claims determinations.
The Dispute Resolution Procedure is laid out in Section XIV of the Settlement Agreement.

### G.  Payment of Claims

As described in Section XV of the Settlement Agreement, Defendants shall make all
payments due on all valid claims submitted by Class Members within 30 days of the final
determination of the last pending disputed claim.  *Id.* at ¶ 102.

### H. Class Representative Incentive Award

Class Counsel will ask the Court to approve an incentive award to Plaintiff Beatty of $20,000.  Subject to the Court's approval, Defendants will pay Plaintiff Beatty an incentive award not to exceed $20,000.  *Id.* at ¶ 118.  This award will compensate Plaintiff for the substantial time and effort Dr. Beatty and his employees devoted to this litigation, including many days of going through paperwork and files and searching for documents, responding to interrogatories, producing documents, and communicating regularly with counsel.  This amount will *not* be applied to the settlement cap of $10 million.  *Id.* ¶ 115-119.  Incentive awards for class representatives are appropriate and promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits.  *See Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (approving incentive award of $25,000); *see also* Manual for Complex Litig. § 21.62, n. 971.

### I. Attorneys' Fees and Costs

The Defendants will not oppose Class Counsel's request for attorneys' fees totaling no more than $3,000,000 (30% of the settlement cap of $10 million, and approximately 23% of the $13 million that the Defendants will make available to Class Members and Attorneys) and costs pursuant to Fed. R. Civ. P. 23 totaling $25,000.  Sett. Agrt., § XIX, ¶ 115.  Defendants have agreed to pay the total amount of fees and costs awarded by the Court.  *Id.* at ¶ 116.  The fee award will not be applied to the settlement cap.  *Id.* at ¶ 106, 115.  The fee award and costs will be paid within 30 days of the Effective Date.  *Id.* at ¶ 116.  Thus, these fees and costs will not reduce the individual payments that each approved Claimant will receive.  Plaintiff will submit the request for attorneys' fees and costs in a separate motion.

23

## IV.    PRELIMINARY APPROVAL AND SUBSEQUENT DEVELOPMENTS

On April 3, 2020, the Court entered its Order for Preliminary Approval of Settlement, Doc #512, finding the settlement "sufficiently fair, reasonable and adequate and in the best interests of the Class." The Court appointed Epiq Class Action & Claims Solutions as Class Administrator and instructed it to send the Post Notice via first class mail to all identifiable Settlement Class members within 120 days after entry of the Preliminary Order. By August 1, 2020, sixteen thousand one hundred and twenty-six (16,126) notices had been mailed. Beginning July 31, the notice was publicized using banner/search ads and the notice was published in the Journal for the American Medical Association on August 25, 2020. A settlement website was created, www.beattyinterestclassaction.com, containing the Claim form, Exclusion form, Publication Notice Form, settlement agreement, and other supporting documents.

Since notice has gone out, there have been over 120 calls to the claims administration support line, and over 11,000 hits on the settlement website.

The Settlement was also favorably announced by the Illinois State Medical Society and mentioned favorably in several news websites such as WorkCompCentral.com.

All objections and opt outs were due on November 7, 2020. No objections were received, and 28 opt outs were processed. A list of opt-outs received to date is attached as Exhibit 6. The deadline for filing claims is January 21, 2021, but numerous claims have already been received, even though in cases of this nature, as the Court is aware, the bulk of the claims are submitted as the claims deadline approaches.

24

# V.    ARGUMENT

## A.  The Settlement Should Be Approved

Fed. R. Civ. P. 23(e) requires judicial review to determine that any "[s]ettlement, [v]oluntary [d]ismissal, or [c]ompromise" of the claims, issues, or defenses of a certified class is "fair, reasonable, and adequate."  "Federal courts naturally favor the settlement of class action litigation.  Although such settlements must be approved by the district court, its inquiry is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate."  *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) (internal citations omitted).  Facts are considered in the light most favorable to settlement.  *Id.* at 1199 (citing *Armstrong v. Board of School Directors of City of Milwaukee*, 616 F.2d 305, 315 (7th Cir. 1980)).  "In the class action context in particular, 'there is an overriding public interest in favor or settlement.'"  *Armstrong*, 616 F.2d at 312-13 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)).

"The procedure for review of a proposed class action settlement is a well-established three-step process."  *E.g., Stull v. YTB Int'l, Inc.*, No. 08-cv-0565-NJR, 08-cv-0600-NJR, 2015 WL 13631334, at *2 (S.D. Ill. June 8, 2015).  First, the court preliminarily approves the settlement if appropriate.  Second, notice is sent to all class members.  Third, the court issues a final approval order after notice is provided and a hearing is held to consider the fairness of the settlement.  *Id.*; *Smith v. Volkswagen Group of Am., Inc.*, No. 13-cv-0370-MJR, 2014 WL 12160767, at *1 (S.D. Ill. May 27, 2014) (citing Manual for Complex Litigation (Fourth), § 21.632 (2004)).

Whether a settlement is fair, reasonable, and adequate is based on a consideration of the factors in Rule 23(e)(2), which are whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:
   (i) the costs, risks, and delay of trial and appeal;
   (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
   (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
   (iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The recently-amended criteria and considerations in Rule 23 "overlap with the factors previously articulated by the Seventh Circuit." *Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079 (S.D. Ill. December 18, 2018). Prior to the recent amendments to Rule 23, which went into effect on December 1, 2018, the Seventh Circuit considered various factors when determining whether a proposed class action settlement is fair, reasonable, and adequate, including: (1) the strength of the plaintiff's case on the merits balanced against the amount offered in the settlement; (2) the complexity, length, and expense of continued litigation; (3) the amount of opposition to the settlement; (4) the opinion of experienced counsel; and (5) the stage of the proceedings that the amount of discovery completed. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

**1. The Settlement Agreement Meets the Rule 23(e)(2) Factors**

This Settlement meets all factors. To begin with, however, we note that "[i]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation ...." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.1982) ; *see also Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 312-13 (7th Cir. 1980 ) ( "It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement," and "in the class action context in particular, there is an overriding public interest in favor of

settlement.") (Internal quotations and citations omitted), *overruled on other grounds* by *Felzen*

*v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also In re AT&T Mobility Wireless Data*

*Sers. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. 111. 2010) ("Federal courts naturally favor the

settlement of class action litigation") (*citing Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)).

The proposed settlement in this matter is fair, reasonable and adequate, and is in the best interests

of the putative class and the public, and hence should be approved.

Each of the four considerations under Rule 23(e)(2) is met as explained below in

subsections (i) through (iv).  Certification of the class is examined below in section (v).

> ### i.   Rule 23(e)(2)(A) – The Class Representative and Class Counsel Have Adequately Represented the Classes

The Court must determine whether the Class Representative and Class Counsel have

adequately represented the Class.  Rule 23(e)(2)(A).  Through the various hearings held and

briefs filed in this case, it is clear that Plaintiff Beatty and Plaintiff's counsel have adequately

represented the Class.  Plaintiff has prevailed on numerous motions to dismiss the Complaint and

the Second Amended Complaint and has survived multiple summary judgment motions.

Adequate representation is particularly evident given the history of the interest payments at the

heart of this case.  Plaintiff has succeeded where others have not and where the Illinois

government has long sought a solution to this complex, disputed issue that impacts the Illinois

healthcare system.  Plaintiff survived the motion practice, accomplished much in discovery, and

then negotiated a complex settlement despite the failure or dismissal of past attempts to recover

similar damages regarding interest allegedly owed on late-paid workers' compensation bills.

The long and difficult negotiations needed to accomplish this result also evidence the adequate

representation of the Class.  Finally, Plaintiff, Dr. Beatty, and his employees put forth

considerable effort and time assisting counsel in preparing for this litigation and in discovery and negotiations after the case was filed.

> ### ii.    Rule 23(e)(2)(B) – The Proposal Was Negotiated at Arm's-Length and With the Assistance of an Experienced and Skilled Mediator

Under Rule 23(e)(2)(B), the second factor is whether the proposal was negotiated at arm's length.  That is certainly the case here.  The parties conducted a two-day, in-person mediation with Judge Wayne Andersen (retired) as mediator and then continued to negotiate on the Term Sheet and the Settlement Agreement for many months.  This Settlement was hotly contested and nearly fell apart at multiple junctures.  The fact that this Settlement was negotiated at arm's-length is evidenced by Judge Andersen's declaration.  Exhibit 4 at ¶¶ 6-15.

Significantly, courts routinely hold that settlements resulting from mediation before an experienced and able mediator are free of collusion, the result of arm's-length negotiations and therefore presumptively fair.  *See e.g., McCue v. MB Financial, Inc.*, 2015 WL 4522564, *4 (N.D. Ill. July 23, 2015) ("As experienced class action employment mediator … assisted the Parties with the settlement negotiations and presided over the day-long mediation.  This reinforces the non-collusive nature of the settlement"); *In re Southwest Airlines Voucher Litigation,* 2013 WL 4510197, *8 (N.D. Ill. Aug. 26, 2013) (approving settlement mediated by Judge Andersen); *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014) (approving settlement as it "was reached through extensive arm's-length negotiations with an experienced third-party mediator …"); *Harris v. Chevron U.S.A., Inc.*, 2019 WL 5846917, *3 (W.D. Okl. July 29, 2019) ("Utilization of an experienced mediator during the settlement negotiations supports a finding that the settlement is reasonable, was reached without collusion, and should therefore be approved"); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 2011 WL 5244707, at *4 (S.D.N.Y. Nov. 2, 2011)  (parties were entitled to a presumption of fairness where mediator

28

facilitated arm's length negotiations); *In re AOL Time Warner, Inc. Sec. Litig.*, 2006 WL 903236,
at *6 (S.D.N.Y. Apr. 6, 2006)  (noting that involvement of mediator in pre-certification
settlement negotiations helped "ensure that the proceedings were free of collusion and undue
pressure").  Here, as set forth in the Andersen Declaration, the mediation process involved
lengthy in-person sessions and numerous teleconferences and discussions over a period of many
months.  The settlement was reached only after months of hard-fought negotiations mediated by
Judge Andersen, a skilled and able mediator, demonstrating the fairness and reasonableness of
the proposed settlement.

### iii.    Rule 23(e)(2)(C) – The Relief Provided for the Class is Adequate

The third factor is whether the Settlement provides adequate relief to the Class, which
takes into account:

> (i) the costs, risks, and delay of trial and appeal;

> (ii) the effectiveness of any proposed method of distributing relief to the class,
> including the method of processing class-member claims;

> (iii) the terms of any proposed award of attorney's fees, including timing of payment;
> and

> (iv) any agreement required to be identified under Rule 23(e)(3)

Rule 23(e)(2)(C).  This factor, including the four subfactors, overlaps with the considerations
analyzed by courts in the Seventh Circuit prior to the most recent amendment to Rule 23.  *See*
*Hale,* 2018 WL 6606079 (S.D. Ill. December 18, 2018); *Synfuel Techs*, 463 F.3d at 653.

The terms of this Settlement provide substantial benefits to Class Members, including
reimbursement of interest from dozens of carriers who were not named as defendants in the case
and therefore had no exposure in this suit.  These terms were negotiated and agreed to with the
assistance of a well-respected mediator after many months of arm's-length negotiations.
Although Plaintiff's counsel has confidence in the strength of this case, there would have been a

number of defenses to overcome before trial, at trial, and on appeal.  A proposed class actions

settlement is presumptively fair when it was "reached in arm's-length negotiations between

experienced, capable counsel after meaningful discovery."  *Am. Int'l Group, Inc. v. ACE INA*

*Holdings*, No. 07-2898, 2012 WL 651727, at *2 (N.D. Ill. Feb. 28, 2012); *see also* 4 Herbert B.

Newberg & Alba Conte, *Newberg on Class Actions* ("Newberg") § 11.41 (4th ed. 2002)..

> ### (A)    Rule 23I(2)(C)(i) – Avoiding the Costs, Risks, and Delay of Trial and Appeal And Other Benefits to the Class from the Settlement

The principal benefits to class members are (1) the opportunity to collect interest

on late-paid bills, (2) the ease of the claims process under which class members will receive a

portion of the interest due by supplying minimum documentation regarding their claim, (3)

avoiding the risks inherent in obtaining class certification and the probable subsequent

appeals, (4) avoiding the risks inherent in a trial and appeal in this unique case with factual

novelties and legal complexities, (5) avoiding the delay in payment that would be inevitable

if this case proceeded to trial and appeals; and (6) the separate payment of Plaintiff's

attorneys' fees by Defendant

> ### 1.    The Opportunity to Collect Interest on Late-Paid Bills.

Pursuant to the Settlement Agreement, each Class Member now has the opportunity to

obtain cash payments as a result of allegedly unpaid interest on late-paid medical bills (e.g., bills

paid more than 30 days after receipt).  Class Members have this right not only against

Defendants, but against dozens of their affiliates who were not named as parties in this suit.  The

Class payments can total up to $10,000,000.  As explained above in Section III.B., Class

Members making valid claims can receive 50% of interest on claims paid between 31 and 120

days after receipt by the Carrier Defendant or the TPA Defendant (where that TPA Defendant

handled the claim on behalf of an insurance carrier and not a self-insured employer), 35% of

interest on claims paid between 31 and 120 days after receipt by the TPA Defendant where the

TPA Defendant handled the claim on behalf of a self-insured employer), and 15% of interest on

claims paid in excess of 120 days after receipt by the Carrier Defendant or TPA Defendant.  Sett.

Agrt. ¶ 45.  The benefits to the Class are enhanced, because they will receive their payments with

no deduction for attorneys' fees, legal expenses, settlement administration expenses, or class

representative service payments.  Such fees and costs will be paid separately.

    This is an excellent outcome.  Prior to this litigation, the Class had no recourse or

opportunity to collect interest on late-paid medical bills despite such interest being mandated by

statute.  This lack of recourse was largely due to the fact that healthcare providers could not

bring a direct cause of action under the IWCA.  Further, even if other counsel had figured out a

viable way to litigate outside the IWCA on behalf of an individual client who was owed interest,

individual lawsuits to collect interest on a bill would not be effective or efficient due to the cost

of litigation.  This problem loomed large in the healthcare industry for many years.  As the

Illinois State Medical Society informed the Illinois General Assembly, the IWCA mandates that

medical providers be paid interest on late-paid bills, but "there is no way" for medical providers

to enforce the IWCA's interest provision.  Exhibit 3 (ISMS Mem., May 4, 2015) (stating that the

IWCA provides "a 'right' which has no 'remedy'" and calling the 2011 reform to the IWCA an

"empt[y] promise").

    Moreover, as noted above, Defendants have indicated an intent to appeal each and every

substantive ruling in this case to the Seventh Circuit in the absence of a settlement.  While

Plaintiff certainly believes in the efficacy of all its positions, given that no previous case allowed

recovery by the providers in these circumstances, any appeal to the Seventh Circuit could

certainly have resulted in the class receiving no benefits at all or only receiving benefits years

down the road, which further demonstrates the appropriateness and adequacy of the instant settlement.

### 2. Ease of the Claims Process.

"Claims made" settlements similar in nature to the settlement here have often been approved in this Circuit. *See, e.g., Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 832 (7th Cir. 2018) (approving a claims made settlement structure); *Daluge v. Cont'l Cas. Co.*, No. 15-CV-297-WMC, 2018 WL 6040091, at *2 (W.D. Wis. Oct. 25, 2018) (citing *Camp* and granting final approval as to claims made settlement structure).

Here, in cases of late payment, but where the payment was made within 120 days or less of the receipt of charges by a defendant, a class member need only provide the name of the carrier and patient to whom the service was rendered to perfect the claim. For cases in which payment was made by a defendant more than 120 after the receipt of the provider's charges, the class member will be required to submit a Form 1500 (the billing document) and, if an EOB was issued, the EOB (Explanation of Benefits) to perfect the claim. These are the fundamental documents which a class member will likely have to consult in any event to determine if a claim exists and whether the bill was paid more or less than 120 days late, because these documents contain information on the patient, the care provided, when the bill was sent, and when payment was made. The Form 1500 will show when the bill was sent by the provider to the carrier or its agent. The EOB will show when the bill was paid and may show when it was received.    !!!

For claims in which payment was received more than 120 days after the invoice was received by a defendant, if the defendant cannot locate the claim, the defendant may seek additional data elements from the provider unless those data elements are already contained in the submitted information (e.g., the Form 1500 or EOB). As a practical matter, most of these

32

additional data elements are typically found on the face of the EOB, so additional records

searching is unlikely to perfect a claim.

The settlement also provides for an expeditious and fair claims resolution process.  If a

Class Member's claim is deficient, they will be provided with notice of a deficiency and the

ability to provide the required information to make their claim effective.  Within 110 days of the

due date for the last Class Member to provide information in response to a deficiency notice,

defendants will notify the claimant of the amount they propose to pay with a brief explanation of

the amount proposed.  If the claimant does not agree to accept the proposed amount, and the

claimant and defendant cannot come to an agreement during a meet and confer period, the

claimant may submit the dispute to a Neutral Evaluator ("Neutral") for a decision.  The Neutral

will choose either the amount proposed by the claimant or the amount proposed by a Defendant.

The Neutral's fees will be paid by Defendant unless the Neutral chooses the payment proposed

by Defendant.  In that event, the claimant will be required to pay up to 25% of the Neutral's

fees—claimant's payment cannot exceed the value of any disputed claims payments due the

claimant.  Finally, the Neutral fee is limited as no more than one hour will be spent on any

dispute between a Defendant Group and Class Member.   !

### 3.  Avoiding the Risks Inherent in Obtaining Class Certification and Appeals Process.

The Settlement between the parties was reached before Plaintiff's Motion for Class

Certification was considered by the Court.  As a result, the risks associated with that process

have been avoided.  That is of particular importance because of the complexities of "contested

claims" and the challenge those claims pose in the context of class certification.

The claims of the class fall generally into two categories: uncontested and contested

claims in the workers' compensation arena.  Plaintiff alleges that Defendants failed to pay class

members interest due under the IWCA.  When an injured worker files an IWCA claim, the employer (or its insurance company or TPA designee) either accepts the claim as compensable or denies liability.

In uncontested cases in which liability is accepted, the interest owed is determined by a simple mathematical calculation based on the date the provider bill was received and the date on which it was paid.  However, in contested cases, the employer can maintain a variety of defenses to the claim.  In this class action, Defendants would strenuously assert that these numerous and different defenses render contested claims not subject to interest payments and, at the very least, unsuitable to class certification.  For example, because these contested cases often end with a settlement agreement or an award from the Commission, Defendants have argued that any obligation on Defendants to pay interest is extinguished upon such a settlement or award.  Defendants point to Section 8.2(e)(10), (15), and (20) to support this position and argue that the IWCA makes clear that the employee is liable to pay the provider, including any interest, where the claim is a contested claim.

While Plaintiff believes that all such defenses would be overcome, there is no certainty that this Court would grant class certification to these types of claims, or if, ultimately, the Defendants would have any liability for contested cases.  Moreover, Defendants would attempt to appeal any class certification or merits order by this Court to the Seventh Circuit.  This Settlement eliminates the inherent risks on class certification and the inherent risks of the appeal process on any number of issues.  With respect to contested cases, if such cases were not included in a class certification order or were excluded after an appeal, then the damages available to the Class, if any, would be greatly reduced.  Avoiding these risks is one of the chief advantages of this Settlement.

### 4.  Avoiding the Risks Inherent in a Trial and Appeal.

Settlements avoid the expense and risks associated with a trial and any appeals.  Here,
Defendants have already made clear that multiple issues will be appealed.  And, as this Court is
aware, this is largely a case of first impression.  It is the first case in Illinois in which a medical
provider has asserted a right to recover interest due under the Act under the "unfair practice"
provisions of the Illinois ICFA.  Defendants have maintained that Plaintiff has no cognizable
claim under the ICFA as set forth in their various motions to dismiss.  The Court's Order finding
otherwise will be appealed in the absence of a settlement.  The same is true regarding any class
certification order or judgment in favor of Plaintiff, particularly one that included contested
cases.

These appeals would involve arguments including, but not limited to, whether Plaintiff
lacks standing and whether the Court misinterpreted the IWCA and/or misapplied the ICFA.  By
their very nature, appeals in cases of first impression are risky propositions because precedent
does not fully guide or fully inform the appellate court.  Avoiding appeals in this case is highly
advantageous to the class.

### 5.  Avoiding the Costs and Delays of Litigation, Trial, and Appeal.

"Settlements promote the interests of litigants by saving them the expense and
uncertainty of trial and promote the interests of the judicial system by preserving public
resources."  *Remijas v. Neiman Marcus Grp. LLC*, 341 F.Supp.3d 823, 825 (N.D. Ill. 2018).
This is why, "[a]s the Seventh Circuit has recognized, federal courts 'naturally favor' the
settlement of class action litigation."  *Id.*  This settlement avoids the costs and delays of
protracted litigation that would involve months of expensive, contested discovery before and
after class certification followed by trial and appeal.  Every step of this case has been hotly

contested and drawn out, and continued discovery would involve an enormous amount of data,

records, and documents.  The large number of Defendants has added, and would continue to add,

to the complexity, difficulty, costs, and time involved in litigating the case to finality.

Without a settlement, even if Plaintiff prevailed and the Class was able to collect on some

or all of the alleged damages against some or all Defendants, the Class would have to wait much

longer to collect any interest payments.  This settlement promotes the interests of the Class, the

public, and the judicial system by saving time, expense, uncertainty, and public resources.  *See

id.* at 825; *see also Isby v. Bayh*, 75 F.3d 1191, 1199-1200 (7th Cir. 1996); *Gehrich v. Chase

Bank USA, N.A.*, 316 F.R.D. 215, 229-230 (N.D. Ill. 2016) (noting that this factor "strongly

favors" approval of settlement when the parties had conducted limited discovery, an enormous

quantity of data would have to be analyzed, and substantial motion practice would occur because

settlement prevents delay "even putting aside the near certainty of appeal.").

### 6.   Payment of Plaintiff's Attorneys Fees by Defendants.

The settlement provides that Plaintiff's attorney fees will be paid by Defendants.  The

fact that Defendants are paying Plaintiff's attorneys' fees results in the entirety of the

$10,000,000 being available to pay damages to the Class with no deduction for attorneys' fees.

The settlement agreement caps Defendants' liability at $10,000,000.  It further provides

that Defendants will pay attorneys' fees in the amount of $3,000,000 over and above the

$10,000,000 in potential payments to the Class.

### (B)   Rule 23(e)(2)(C)(ii) – Method of Distributing Relief to the Class

Next, the Court must consider "the effectiveness of any proposed method of distributing

relief to the class, including the method of processing class-member claims."  Rule

23(e)(2)(C)(ii).  As described above in Sections III.F and III. G, the proposed method is

effective.  All Class Members presently known to Defendants received personal notice.  Sett. Agr., § VII.  Personal notice was supplemented by publication notice.  *Id.*  That notice explained in clear and simple terms how to make a claim and the potential relief available.  The claims process is being administered by Epiq, an experienced and well-respected claims administrator. As explained in Section XV of the Settlement Agreement, "Defendants shall make all payments due on all valid claims submitted by Class Members within thirty (30) days of the Neutral Evaluator's final determination of the last pending disputed claim between any Class Member and any Defendant(s).  The Claims Administrator shall be responsible for collecting the necessary funds from the Defendants and issuing the payment checks on each Defendants' behalf to individual Class Members."  This method has routinely been approved in this Circuit.  *See, e.g., Camp Drug Store*, 897 F.3d at 832 (7th Cir. 2018); *Daluge*, 2018 WL 6040091, at *2.

### (C)    Rule 23(e)(2)(C)(iii) – Attorneys' fees

In the Seventh Circuit, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time."  *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001).

In determining whether the relief provided the Classes is adequate, the Court must also consider "the terms of any proposed award of attorney's fees, including timing of payment." Rule 23(e)(2)(C)(iii).  Section XIX of the Settlement permits Plaintiff's counsel to seek the Court's approval for Defendants to pay Class Counsel fees and expenses up to $3,025,000. "Subject to the Court's approval, Defendants will pay Class Counsel an amount not to exceed $3,000,000.00 in attorneys' fees and $25,000.00 in reimbursed costs and expenses, in addition to and without diminishing in any way the benefits afforded to the Class under this Agreement. Class Counsel agrees not to seek approval of an award for attorneys' fees and costs and expenses in an amount exceeding $3,025,000.00 in total.  Defendants will not oppose Class Counsel's

37

application to the Court for approval of the attorneys' fees and costs and expenses, so long as

that application does not seek more than $3,025,000.00." Sett. Agr. § XIX, ¶ 114.

This settlement is fair, reasonable, and adequate with respect to attorneys' fees. The fees

and costs paid by Defendants will *not* be applied to the settlement caps. *Id.* The fees will not

impact the relief available to the Class or any individual Class Member. The Defendants have

agreed not to oppose a request for attorneys' fees totaling $3,000,000. Three million dollars

represents 23% of the total maximum amount agreed to be paid by Defendants to the Class and

Attorneys, and it represents 30% of the $10 million cap available to the Class.

This is well within the range of attorneys' fees approved in cases of this nature. *See, e.g.,*

*Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014) ("[A]ttorneys' fees awarded to class

counsel should not exceed a third or at most a half of the total amount of money going to class

members and their counsel."); *Beesley v. Int'l Paper Co.*, No. 3:06-cv-703, 2014 WL 375432, at

*1 (S.D. Ill. Jan. 31, 2014) (awarding one-third of class recovery); *In re Dairy Farmers of Am.,*

*Inc. Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 842 (N.D. Ill. 2015) (awarding one-third of $46

million common fund). "[E]ven though common fund cases in which plaintiffs recover more

than $10 million are not perfectly analogous, the fact that courts in this [Seventh] circuit

regularly allow attorneys to recoup one-third of the first $10 million of the class action

settlement fund is, at the very least, instructive." *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 499-

500 (N.D. Ill. 2015) (internal citations omitted). Furthermore, Class Counsel faced substantial

risk by devoting years of work and resources into this case, because Class Counsel agreed to

prosecute this case on a contingency basis with no guarantee of ever being paid. As stated

above, Counsel will submit a separate motion for attorneys' fees and costs that will address the

facts and law supporting their request.

> **(D)    Rule 23(e)(2)(C)**Error! Bookmark not defined.**(iv) - The
> Settlement Agreement**

The Settlement Agreement is the final factor the Court is to consider in determining

whether the settlement provides adequate relief to the Class.  Rule 23(e)(2)(C)(iv).  The

Settlement Agreement is attached as Exhibit 5 and explained in detail herein.

> **iv.    Rule 23(e)(2)(D) – The Settlement Treats Class Members Equitably
> Relative to Each Other**

In determining whether the settlement is fair, reasonable, and adequate, the Court is to

consider whether the proposal treats class members equitably relative to each other.  Rule

23(e)(2)(D); *Hale v. State Farm Mutual Auto. Ins. Co.*, 2018 WL 6606079, at *2, 5 (S.D. Ill.

Dec. 16, 2018).  The Advisory Committee Notes state: "Matters of concern could include

whether the apportionment of relief among class members takes appropriate account of

differences among their claims, and whether the scope of the release may affect class members in

different ways that bear on the apportionment of relief."

Here, the scope of relief affects Class Members the same.  There is only one class.  All

potential benefits of the Settlement Agreement are available to every Class Member.  Sett. Agrt.,

¶ III.A.1.  Although different Class Members will receive different amounts of money based on

the number of claims submitted, the dollar amount of each claim, etc., all Class Members are

treated the same.  With respect to the different categories of claims and different percentages of

interest associated with each category, those percentages take appropriate account of differences

among claims (i.e., contested versus uncontested) and the corresponding defenses associated

with each type of claim as discussed above. In sum, all of the Rule 23 factors discussed above

weigh heavily in favor of final approval of this settlement.  In this regard, the lack of any

objections to the settlement and the extremely small number of opt outs are factors that further

demonstrate the fairness, reasonableness and adequacy of the instant settlement.  *See, e.g., Hale*

*v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *6 (S.D. Ill. Dec. 16, 2018), *appeal dismissed,* No. 19-1080, 2019 WL 3206960 (7th Cir. July 9, 2019) (citing remarkably low level of opposition as "strong circumstantial evidence in favor of the settlement."); *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, No. 16-CV-488-SMY-RJD, 2017 WL 5724208, at *2 (S.D. Ill. Apr. 26, 2017) ("The lack of opposition from any settlement class member also militates in favor of settlement."), *aff'd*, 897 F.3d 825 (7th Cir. 2018). !

### v.    Class Certification

A class may be certified solely for purposes of settlement if a settlement is reached before the Court's determination of class certification. *Butler v. Am. Cable & Tel., LLC*, No. 09-cv-5336, 2011 WL 4729789, at *4 (N.D. Ill. Oct. 6, 2011).   Pursuant to the 2018 amendments to Rule 23(e)(1), the parties must show "that the court will likely be able to ... (ii) certify the class for purposes of judgment on the proposal." Rule 23(e)(1). It should be noted that while Defendants agree that this case meets the standards for approval of a settlement class, Defendants still contest whether the class sought by Plaintiff could ever be a valid litigation class under the differing standards the Court would need to apply to that determination.

### 1.    Numerosity

There are thousands of healthcare providers and physicians that are potential Class Members according to Defendants' own records. The members of the Settlement Class are sufficiently numerous to satisfy Rule 23(a)(1). *See, e.g., Muro v. Target Corp.*, 2005 WL 1705828, at *13 (N.D. Ill. July 15, 2005) (40 class members was sufficient).

### 2.    Commonality

There are common questions of law and fact including but not limited to whether Defendants' actions constitute unfair practices under the ICFA and whether Defendants have a

duty to pay interest pursuant to the IWCA.  These common questions of law and fact were

highlighted in Defendants' omnibus motions to dismiss and Plaintiff's summary responses to

Defendants' individual statute of limitations briefs which mirrored each other.  The same is true

for Defendants' various summary judgment briefs.  "A common nucleus of operative facts is

usually enough to satisfy the commonality requirement."  *Keele v. Wexler*, 149 F.3d 589 (7th Cir.

1998).  Here, underlying these common questions is a common nucleus of operative facts

pertaining to workers' compensation healthcare, late-paid bills, and whether, when, and why

interest was or was not paid on different late-paid bills.

### 3.   Typicality

Rule 23's typicality requirement is liberally construed, and it is satisfied here.  *Saltzman*

*v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009).  Here, the Settlement Class Members'

claims derive from the same operative facts:  the Members provided workers' compensation

healthcare services, sent bills to the Defendants or Defendants' agents for such services, were not

paid within 30 days of receipt of the bills, and were not paid interest when the bills were finally

paid.  As a result, Plaintiff alleges that the ICFA was violated, and this same unfair practices

legal theory applies to each Member's claim.  Defendants either provide the insurance policies

related to these healthcare services or administer such policies.  *See Rosario v. Livaditis*, 963

F.2d 1013, 1018 (7th Cir. 1992) (typicality is met the claim "arises from the same event or

practice or course of conduct that gives rise to the same legal theory.").

### 4.   Adequacy

Rule 23's adequacy requirement is also satisfied.  Plaintiff Beatty, the Class

Representative, has a sufficient interest in the outcome to ensure vigorous advocacy, does not

have conflicting interests with the Class, and Plaintiff's lawyers are qualified, experienced, and

able to conduct the litigation.  *See Holtzman v. Turza*, No. 08 C 2014, 2009 WL 3334909, at *5
(N.D. Ill. Oct. 14, 2009).  Plaintiff has a sufficient interest in the outcome and has no conflicting
interests.  Plaintiff's healthcare practice renders services to patients covered under the provisions
of the IWCA.  As a result of the alleged conduct, Beatty has suffered a loss of property and a
detriment to Beatty's business.  Beatty brought this case motivated by the belief that Defendants'
alleged conduct are detrimental to the health of Beatty's patients and to the welfare of the general
public.  Doc. 284 at 2-3.  But for Plaintiff's desire to remedy the alleged wrongs committed
against Plaintiff and other healthcare providers throughout Illinois, the Class would not have the
opportunity to collect past interest as provided by this Settlement.  Plaintiff and Plaintiff's
counsel have vigorously litigation this case and advocated for the entire class of similarly
situated physicians and healthcare providers and, in turn, for the welfare of the general public
since the alleged conduct deprived the class adequate and timely payments needed to maintain
their practices and continue providing care to patients covered under the provisions of the
IWCA.  *Id.*

### 5.  Rule 23(b)(3)'s Predominance and Superiority Requirements

After Rule 23(a) is satisfied, the Court should consider the predominance and superiority
requirements of Rule 23(b)(3):  whether "questions of law or fact common to the class
predominate over any [individualized questions], and that a class action is superior to other
available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.
23(b)(3).  Both requirements are met here.

Predominance is satisfied when "common questions represent a significant aspect of a
case and … can be resolved for all members of a class in a single adjudication."  *Messner v.
Northshore Univ. Health Sys.*, 669 F.3d 802, 815 (7th Cir. 2012).  Here, the key common and

significant questions that can be resolved for all members of the Class include:  whether

providers like Plaintiff have standing to bring an ICFA claim based on Defendants' failure to pay

interest as required by the IWCA and whether the Defendants' alleged conduct constitute unfair

practices under the ICFA.  Plaintiff alleges that Defendants engaged in similar conduct that

violate public policy and constitute unfair practices under the ICFA, and that these violations are

common to the proposed Class, which demonstrates predominance for purposes of Rule 23.

Superiority is satisfied when the case involves numerous class members that share claims

but it would not be economical for the class members to pursue those claims individually.  *See

Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).  Resolution of thousands of

claims in one action is far superior to individual lawsuits and promotes consistency and

efficiency of adjudication.  *Id.*  Here, the thousands of potential Class members share claims and

it would not be economical to pursue those claims individually, especially given that many Class

Members' claims likely total well under $1,000.  Further, there are no issues with manageability

because the claims are being certified for purposes of settlement.  *See Amchem Prod., Inc. v.

Windsor*, 521 U.S. 591, 620 (1997). It should be noted that Defendants, while agreeing that the

standards for approval of a settlement class have been met in this case, continue to contend that

the standards for a litigation class were not and could not have been met here.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant final approval of

the Settlement and enter the Proposed Final Order Approving Class Action Settlement submitted

herewith for the Court's review and consideration.

43

Dated: November 23, 2020                    Respectfully submitted,

                                            **THE SIMON LAW FIRM, P.C**.

                                            */s/ Kevin M. Carnie Jr.*
                                            John G. Simon, #35231
                                            Kevin M. Carnie, Jr., #60979
                                            Patrick R. McPhail, #70242
                                            800 Market Street, Suite 1700
                                            St. Louis, MO 63101
                                            Phone: 314-241-2929
                                            Fax: 314-241-2029
                                            jsimon@simonlawpc.com
                                            kcarnie@simonlawpc.com
                                            pmcphail@simonlawpc.com

                                            Robert H. Wendt, Pro Hac Vice
                                            The Wendt Law Firm
                                            1015 Locust Street, Suite 1036
                                            rwendt@wendtlawfirm.com
                                            Phone: 314-588-0097
                                            *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Southern District of Illinois by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the Southern District CM/ECF system.

                                            */s/ Kevin M. Carnie Jr.*